# CASES AT LAW

DETERMINED IN THE

# COURT OF ERRORS AND APPEALS

OF THE

## STATE OF NEW JERSEY.

### MARCH TERM, 1906.

---

THE STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. ALBERT C. TWINING AND DAVID C. CORNELL, PLAINTIFFS IN ERROR.

Argued March 6 and 7, 1906—Decided November 19, 1906.

1. In determining whether the title of an act expresses its object within the meaning of the clause of the constitution on that subject, there should be attributed to the words used as indicating that object such meaning as they had then acquired in common and legislative usage.

2. The title of the act entitled "An act concerning trust companies (Revision of 1899)," expresses its object to be legislation regulating not only trust companies incorporated under that designation, but also companies organized under the "Act for the incorporation of safe deposit and trust companies," upon which had been conferred broad trust powers and which had been designated in supplements to the last-mentioned act as "trust companies."

3. Such a title includes in its expressed object not only regulation, but also such provision as might be deemed proper to enforce such regulation by penalties or prosecution.

4. A paper exhibited to a person, authorized to examine the condition of a trust company, as the unrecorded minutes of a meeting of directors and containing a resolution for the purchase of shares

of stock which the examiner had discovered among the assets of the company and inquired about, is a "paper" within the meaning of section 17 of the Trust Companies act of 1899, and if false, and exhibited to the examiner with intent to deceive him, the officer or officers exhibiting it were guilty of a crime under that section.

5. The facts presented in the bills of exception justified the trial judge in bringing to the attention of the jury the failure of the defendants to avail themselves of the privilege of testifying in their own behalf. *State* v. *Parker*, 32 *Vroom* 308; *S. C.*, 33 *Id.* 801.

On error to the Supreme Court. For opinion of that court, see *ante p.* 3.

For Albert C. Twining, *Edward M. Colie* and *Gilbert Collins,* with whom was *John G. Johnson,* of the Pennsylvania bar.

For David C. Cornell, *James B. Vredenburgh* and *Marshall Van Winkle.*

For the state, *Henry M. Nevius,* prosecutor of the pleas.

The opinion of the court was delivered by

MAGIE, CHANCELLOR.    The judgment brought before us by this writ of error was rendered in the Supreme Court, and affirmed the conviction of the plaintiffs in error in the Monmouth County Quarter Sessions, upon an indictment which charged them with a violation of one of the provisions of the seventeenth section of the act entitled "An act concerning trust companies (Revision of 1899)," approved March 24th, 1889. *Pamph. L., p.* 450. So far as those provisions affect the present case, they make every director or officer of any trust company, who willfully or knowingly subscribes or exhibits any false paper, with intent to deceive any person authorized to examine as to the condition of such trust company, guilty of a high misdemeanor.

The indictment charged that plaintiffs in error, as directors and officers of the Monmouth Trust and Safe Deposit Com-

pany, a corporation organized and existing under the laws of this state, intending to deceive a person authorized to examine as to the condition of said company, did exhibit and show to him a certain false paper, of a tenor and effect expressly stated. The falsity of the paper exhibited was expressly charged.

It is first contended on behalf of the plaintiffs in error that the provisions contained in the seventeenth section of the Trust Companies act of 1899 did not operate upon the officers or directors of the Monmouth Trust and Safe Deposit Company. This is urged upon the ground that the said company did not fall within the object expressed in the title of that act.

It is argued that the title, "An act concerning trust companies," neither includes nor expresses any object of legislation respecting safe deposit and trust companies, and is therefore open to the objection that any provision therein respecting such companies is not within the object disclosed by the title. The inclusion of any legislation in this act respecting safe deposit and trust companies is claimed to be obnoxious to the constitutional provision contained in *placitum* 4, section 7, article 4 of the constitution, which reads as follows: "To avoid improper influences which may result from intermixing in one and the same act such things as have no proper relation to each other, every law shall embrace but one object, and that shall be expressed in the title."

The meaning of this constitutional provision does not admit of the least doubt. It has been thoroughly settled by repeated decisions of our courts, including the court of last resort, that to accord with this constitutional provision the title of every act must not only include, but must also express, its object. While the title need not include nor express the means by which the legislation proposed is to effect that object, it must plainly express that object. *Rader* v. *Township of Union,* 10 *Vroom* 509; *Stockton* v. *Central Railroad Co.,* 5 *Dick. Ch. Rep.* 70; *Newark* v. *Mt. Pleasant Cemetery Co.,* 29 *Vroom* 172; *Payne* v. *Mahon,* 15 *Id.* 213; *Mortland v. Christian,* 23 *Id.* 521; *Johnson* v. *Asbury Park,* 31 *Id.*

427; *American Surety Co.* v. *Great White Spirit Co.*, 13 *Dick. Ch. Rep.* 526.

It seems to have been proved on the trial of the indictment, and it is conceded in this argument, that the Monmouth Trust and Safe Deposit Company was organized under the act entitled "An act for the incorporation of safe deposit and trust companies," approved April 20th, 1885. *Pamph. L., p.* 270. That act conferred upon corporations organized thereunder power to receive on deposit property of every kind, and to collect coupons for interest upon bonds and securities thus deposited. The meager powers that were thus conferred were from time to time greatly extended. By a supplement to the last-mentioned act, passed April 6th, 1886 (*Pamph. L., p.* 207), corporations organized under that act, which had a certain capital, were authorized to act as agents to transfer and register and countersign, and to buy and sell, stocks and bonds or other obligations of any other corporation or public authority, and to receive and manage any sinking fund therefor, and to act as assignees, receivers, agents, executors, administrators or guardians, and to execute trusts of every description. It is obvious that the dual functions which these corporations were permitted to exercise by the original act, viz., the accepting of deposits of property and the execution of trusts, were largely extended by the provisions of the last-mentioned supplement in respect to the function last named.

By an amending act, purporting to amend the supplement to the original act (which must be the supplement above mentioned), approved May 6th, 1887 (*Pamph. L., p.* 262), the provisions of that supplement were again enacted, probably because the supplement had not been approved, but had become a law without approval.

By a further supplement to the original act, approved February 6th, 1888 (*Pamph. L., p.* 19), any corporation organized thereunder, in any city in which there is no national bank of deposit or discount, was authorized to discount notes, bills and evidences of debt, and to buy and sell bullion and to buy and sell commercial paper, provided that by the vote

of two-thirds of the stockholders and the unanimous vote of the board of directors it accepted the privileges thus conferred.

By a further supplement to the original act, approved March 13th, 1888 (*Pamph. L., p.* 164), corporations organized under the original act were permitted to be appointed to any and all trusts by any officer or court of this state, without being required to give security for the discharge of the duties of such trust or appointment to office.

By "An act relative to safe deposit and trust companies," approved June 10th, 1890 (*Pamph. L., p.* 431), any safe deposit and trust company organized under any law of this state was authorized to receive money on deposit and to pay out the same on demand, or otherwise, as agreed.

By a further supplement to the original act, approved March 14th, 1893 (*Pamph. L., p.* 288), further powers were conferred on any "trust company" incorporated or organized under that act and doing business in any city or village where there is no national or state bank of discount and deposit, to discount bills and perform other functions in buying of bullion and bills of exchange and commercial paper, provided the company obtained the consent of two-thirds of the stockholders and a unanimous vote of its board of directors.

By a further supplement to the original act, approved April 26th, 1894 (*Pamph. L., p.* 150), companies organized thereunder were authorized to become surety for receivers, executors, administrators, guardians, trustees or assignees.

By an amending act, approved April 22d, 1894 (*Pamph. L., p.* 152), further power was conferred upon corporations organized under the act respecting discounting of commercial paper and the purchasing of bullion and bills of exchange. A further supplement to the original act, approved May 1st, 1894 (*Pamph. L., p.* 193), seems to permit parties for whom corporations organized under the original act had become surety to agree respecting the deposit of the moneys and the safekeeping of the assets for which they were to be held responsible.

By a further supplement, approved March 25th, 1895

(*Pamph. L., p.* 445), additional powers were conferred upon corporations organized under the original act respecting the appointment of such corporations to an office of trust without being required to give security, when the capital stock and accumulated surplus reached a certain point.

By a further supplement, approved May 12th, 1896 (*Pamph. L., p.* 348), additional powers were conferred on "any trust company organized under said act."

By an amendment to the supplement of 1894, approved March 30th, 1897 (*Pamph. L., p.* 136), any party from whom a bond was required might agree with his surety or sureties for the deposit or safekeeping of money or property for which he might be responsible, in any "safe deposit or trust company authorized to do business as such in this state," in such manner as to prevent the withdrawal of such property without the written consent of such surety or an order of the court on notice to such surety.

The examination of these legislative acts clearly indicates that while the safe deposit feature of these corporations may perhaps have originally been the predominant one, by gradual additions to the powers conferred by the original act the trust feature of the corporations had enormously increased. It is not too much to say that it became the predominant feature of these corporations, and the legislature seems to have recognized it by calling the companies, in several of the supplements above referred to, "trust companies."

Prior to 1885 several trust companies had been incorporated by special laws. The question is whether the title of the act under which plaintiffs in error were indicted expresses its object to be to legislate only respecting trust companies thus created. I am unable to discover that its title thus limited its object to those companies which under special charters had acquired a special name as trust companies. On the contrary, I think that the expressed object extended to all companies having the features, characteristics and powers usually acquired by trust companies, although they also had the additional powers of safe deposit companies. The object expressed by the title "trust companies" applied to all those

companies which had acquired the capacity of trust companies, and had been known in legislative usage as trust companies. It is matter of common knowledge that, after these companies had been clothed with extensive trust powers by the legislation above shown, they were commonly known and designated as trust companies, and the legislature, in applying to them the name "trust companies," adopted the popular designation. That such was the understanding of the legislature seems apparent from section 30 of the act in question, which expressly declares that its provisions shall be applicable to, and the words "trust company" used in the act shall be considered to include all trust companies and all safe deposit and trust companies heretofore organized under the laws of this state. It is true that this provision will not cure a defect in the title of this act, if any defect there exists, and it is only alluded to for the purpose of indicating that the legislative usage was retained, which recognized these companies as "trust companies."

It results, in my judgment, that the title of the act of 1899 expressed the object of the act to be legislation concerning trust companies, including not only such corporations as were trust companies *eo nomine,* but all corporations which had the functions of trust companies and were recognized in legislation as such.

It is further insisted that the provisions of section 17 of the act of 1899, in so far as they make the acts of officers, &c., criminal, are not within the object expressed in the title.

The title indicates the legislative purpose to be directed to such trust companies. Such legislative purpose necessarily includes regulation of such companies, including the regulation of those who direct or act for them, and the enforcement of such regulations. That enforcement is usually provided by enactments for penalties for the breach of the regulations, and this, which Blackstone calls the sanction of the law, seems necessarily included in the title, which expressed the object to be to regulate certain corporations. The Supreme Court, in its opinion, has pointed out many instances in which this mode of legislation has been resorted to in this

state, and this objection was properly treated and disposed of in the opinion below. It may be added that such an objection was pronounced invalid by the Supreme Court in *Hickman* v. *State,* 33 *Vroom* 499, and the judgment in that cause was affirmed in this court (34 *Id.* 666), on the opinion of the Supreme Court. The doctrine was again stated in the Supreme Court in *State* v. *Corson,* 38 *Id.* 187, and in *State* v. *Lee,* 41 *Id.* 368.

It is further contended that the indictment fails to charge against the plaintiffs in error any crime within the meaning of the seventeenth section. If it does show a crime it is because it charges the exhibition, to a person authorized to examine into the condition of the Monmouth Trust and Safe Deposit Company, of a false paper, with intent to deceive him as to the condition of such company. It is strenuously urged that the word "paper" must have been used in a limited sense, and to include only commercial paper.

I agree with the Supreme Court in the view that the construction thus given is too narrow. These trust companies, while permitted, under certain circumstances, to discount or buy commercial paper, were also permitted to invest their assets in many other modes, and thus received securities other than those comprehended under the term "commercial paper." It does not admit of a doubt, in my judgment, that the word "paper," in connection with the prohibition against subscribing or exhibiting a false paper with intent to deceive an examiner as to the condition of the trust company, must be extended, at least to all the assets of the company, and all incidents respecting such assets which were committed to paper are included in this word. A false bond and mortgage would be included. A fabrication of an acknowledgment to a genuine mortgage would be included. In short, anything committed to paper that was capable of throwing light upon the condition of the company, and used to deceive the examiner, is included in this language.

In this case there was evidence that the trust company had some time previously made a large payment upon certain shares of stock of a national bank. The payment was not

in full and the stock appears not to have been then delivered or transferred. Just prior to the time the Monmouth Trust and Safe Deposit Company closed its doors, an additional payment was made upon the bank stock, and the same was received by the trust company and found among its assets. The indictment charged that the defendants exhibited a paper purporting to be the unrecorded minutes of a meeting of the directors of the trust company, and a resolution to purchase this stock. It was important in its effect upon the condition of the trust company, and the duty of the examiner in respect to this claimed asset was to ascertain whether the stock had been in fact purchased by the trust company through a corporate act competent to bind it. The paper was charged to be false, and this fact seems to have been amply proved and is not contested. In my judgment, it was a paper within the meaning of section 17, and if exhibited to the examiner with intent to deceive him as to the condition of the trust company the defendants were properly found guilty. These were questions for the jury and were properly submitted to them.

It is further suggested that the crime of exhibiting such a paper cannot be committed by two persons. I am unable to find any substance in this contention. Physically, a paper may be exhibited by two persons; constructively, such an exhibition may be made, and I am unable to perceive any reason why the indictment, in charging them jointly, was an improper charge.

Lastly, it is contended that the trial judge erred in bringing to the attention of the jury the fact that the defendants, though present in court, had not offered themselves as witnesses in their own behalf.

The legislation in this state permitting persons accused and indicted for crime to become witnesses in their own behalf contains no enactment restricting observation by the court or prosecutor upon the failure of a defendant to avail himself of the privilege thus accorded him. In the case of *State* v. *Parker*, 32 *Vroom* 308, it was pointed out that legislation of similar character, enacted by the congress of the

United States and by legislatures of many states in the union, contained such restrictions. In the absence of such restrictions in our legislation, it was there held that when the evidence given on the part of the state, in the presence of the defendant, directly showed acts of his, in respect to which he had been given the privilege of testifying, it was not error to direct the attention of the jury to his failure to avail himself of the opportunity of contradicting such direct evidence. The decision of the Supreme Court in this case was affirmed by this court upon the opinion in the Supreme Court. *Parker* v. *State, 33 Id.* 801. We think the doctrine there declared was correct, and are satisfied that its essential features were in no respect diminished or altered by the opinion in the case of *State* v. *Wines, 36 Id.* 31. On the contrary, Chief Justice Depue, in the opinion in that case, points out the distinction, which had been intimated in State *v.* Parker, between the situation of a defendant against whom there was direct evidence of guilty acts, which he failed to deny by his own evidence, though privileged to do so, and his situation when the evidence against him was only circumstantial, and therefore only raised inferences as to his acts.

Other objections presented in the argument are deemed to have been rightly treated in the decision of the Supreme Court.

The judgment brought up by this writ of error must therefore be affirmed.

SWAYZE, J. (dissenting). I think the words "false paper," in section 17 of the act concerning trust companies, are used in the technical sense in which the words would naturally be used by men conversant with the business of banking, and refer to such paper as may constitute assets of the trust company—promissory notes, checks, bonds, mortgages, cash items and paper of that character. The section evinces an intention to punish (1) the subscribing or making of a false statement of facts; (2) false entries in the books; (3) subscribing or exhibiting false paper. These three clauses seem to

me mutually exclusive, and the document now in question naturally comes under the first class, and not under the third.

The meaning of the words ought to be determined from the standpoint of those who drew the act at the time, and not from the standpoint of the chance that happened. The legislature would naturally have thought of a document of this kind as a part of the recorded minutes, and not as a loose paper, and could hardly have meant that every memorandum of the trust company might be a false paper within the meaning of a criminal statute like this.

It is the essential character of the document which ought to determine whether it comes within the definition of the crime denounced by the words "false paper." That essential character does not depend upon the form which the document chanced to take, nor upon the material upon which it chanced to be written. If it had been a fictitious promissory note inscribed upon parchment, I think it would have been false paper, because of its essential character; and so I think it is not false paper when it is essentially a mere statement of facts intended to be recorded in the book of minutes, where it naturally belongs.

DILL, J. (dissenting). I concur in the dissenting opinion of Mr. Justice Swayze, but I also think that there was no proof of exhibition, within the meaning of the statute in question, by the defendant Twining.

*For affirmance*—THE CHANCELLOR, GARRISON, PITNEY, BOGERT, VREDENBURGH, GREEN, GRAY. 7.

*For reversal*—SWAYZE, DILL. 2.